IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BRYAN L. J.,[1]     )
                    )
     Plaintiff,     )
                    )
vs.                 )     Civil No. 18-cv-2020-DGW[2]
                    )
COMMISSIONER OF SOCIAL )
SECURITY,           )
                    )
     Defendant.     )

## MEMORANDUM and ORDER

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB and SSI in December 2014, alleging a disability onset date of May 24, 2013. After holding an evidentiary hearing, an ALJ denied the application on March 22, 2018. (Tr. 20-32). The Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## Issue Raised by Plaintiff

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 14, 20.

1

Plaintiff raises the following points:

1. The ALJ erred in finding that plaintiff's impairments did not meet the requirements of Listings 1.02, 1.03, and 1.04.

2. The RFC assessment was not based on substantial evidence because it was based on the ALJ's lay interpretation of the medical evidence and the evaluation of plaintiff's subjective allegation was flawed.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step 3, precludes

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

a finding of disability.   The plaintiff bears the burden of proof at steps 1–4.   Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy.   *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Biestek v. Berryhill*, 2019 WL 1428885, at *3 (S. Ct. Apr. 1, 2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921

(7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He was insured for DIB through September 30, 2015.[4] The ALJ found that plaintiff had severe impairments of degenerative disc disease with ankylosis, diabetes with neuropathy, osteoarthritis status-post left hip replacement and revision, sleep apnea, and obesity. The ALJ concluded that these impairments did not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to do work at the sedentary exertional level, with nonexertional physical limitations consisting of (1) only occasional climbing of ramps and stairs; (2) no climbing of ladders, ropes, or scaffolds; (3) occasional balancing, stooping, kneeling, crouching, and crawling; and (4) avoiding concentrated exposure to unprotected heights and vibration. He must also have the option to use a cane for ambulating.

The ALJ found that plaintiff could not do his past relevant work as a cleaner or security guard. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because he was able to do other jobs that exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record

---

[4] The date last insured is relevant only to the claim for DIB.

is directed to the points raised by plaintiff.

1.  **Agency Forms**

Plaintiff was born in 1969 and was 49 years old on the date of the ALJ's decision. (Tr. 332). A prior application was denied in May 2013. (Tr. 127). He was 6'1" tall and weighed 339 pounds. He stopped working in January 2012. (Tr. 336-337).

2.  **Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing in November 2017. (Tr. 40).

Plaintiff lived with his wife and two grandchildren. He used a cane to walk all the time. (Tr. 44-45).

Plaintiff testified that he could not work because of his back and left leg. He had a hip replacement and a revision. He could not see the surgeon after the revision because he did not have the money. (Tr. 50-52). He had neuropathy in his feet and hands. (Tr. 57). His back was hurt in an on-the-job accident in 2009. He was hit by a forklift. (Tr. 56).

His wife did all the housework and cooking and took care of the grandchildren. (Tr. 55).

A vocational expert (VE) also testified. The ALJ asked him a hypothetical question which corresponded to the RFC assessment. The VE testified that this person could not do plaintiff's past work, but he could do other jobs that exist in substantial numbers in the national economy. He would be unemployable if he were to miss work more than one or two days per month. (Tr. 68-71).

3. **Relevant Medical Records**

Plaintiff received primary care at Rural Health, Inc. He was usually seen by Physician's Assistant Jeffrey Sherrill. In April 2014, he was seen for a routine visit and reevaluation of his chronic illnesses: diabetes, high blood pressure, high cholesterol, obesity, osteoarthritis, and chronic back pain. He had a left hip replacement in 1995 and his left hip had begun hurting again. He took Norco and Flexeril for his back pain. (Tr. 604). In July 2014, an x-ray of the left hip showed arthroplasty hardware which appeared well seated with normal alignment. There were cystic changes in the greater trochanter of the femur. The impression was no acute abnormality of the left hip. (Tr. 607).

He was ambulating normally in August and November 2014, and in January 2015. (Tr. 590, 596, 599).

Plaintiff complained that his back pain was not getting any better in April 2015. Ambulation was limited. (Tr. 640-642). He was still having hip pain in June 2015 and was scheduled to see an orthopedist in August. (Tr. 648). In July he complained of a chronic feeling of pins and needles in his feet. He had a history of poorly controlled diabetes. A monofilament test showed abnormal sensation. He was prescribed gabapentin for diabetic neuropathy. (Tr. 652-655).

Dr. Adrian Feinerman performed a consultative exam in August 2015. Plaintiff walked with a cane but was able to walk fifty feet without it. He was unable to get on the exam table, so the exam was done in a chair. He was unable to tandem walk, stand on his toes or heels, squat, or arise from a chair. Dr.

6

Feinerman was unable to evaluate his hips because he was sitting. Straight leg raising was negative. Plaintiff would not flex or extend his lumber spine, so the range of motion could not be measured. (Tr. 624-633).

PA Sherrill did a pre-op physical on November 4, 2015. Plaintiff had an irregular gait and malalignment and limited range of motion on musculoskeletal exam. (Tr. 674).

Dr. Roland Barr performed the revision surgery on November 30, 2015. His operative report states that there was "radiographic evidence of advanced polyethylene wear and progressive osteolysis around the acetabular component as well as the greater trochanter." The diagnosis was "failed left total hip arthroplasty with advanced polyethylene wear and progressive osteolysis."[5] Surgery was indicated "to relieve pain and arrest the progression of osteolytic bone loss . . . and reduce the risk of associated complications such as total arthritic fracture or major implant loosening." (Tr. 778). Plaintiff made "excellent progress with physical therapy" and was discharged the next day. (Tr. 765).

PA Sherrill saw plaintiff for medication refills in February 2016. Plaintiff's gait was "irregular" and there was "malalignment and limited ROM" on musculoskeletal exam. Norco was prescribed. (Tr. 897-899). The findings were the same in April 2016. (Tr. 892). PA Sherrill prescribed an adjustable locking offset cane. (Tr. 823). In September 2016, plaintiff wanted to discuss getting an order for a bigger cane. (Tr. 874). Plaintiff saw PA Sherrill for

---

[5] Following a joint replacement, "occasionally, 'wear debris' from the breakdown of materials in the hip or knee implant can accumulate in the surrounding tissues. This causes local inflammation that destroys the bone and loosens the prosthesis, a condition called osteolysis." https://www.hss.edu/ condition-list_osteolysis.asp, visited on July 23, 2019.

medication refills in November 2016. Her reported that his pain medication controlled his symptoms well without adverse reaction. On exam, ambulation was limited, and he used a cane. He continued to have "malalignment and limited ROM" on musculoskeletal exam. (Tr. 869-870).

Plaintiff was hospitalized for a transient ischemic attack involving the right internal carotid artery in December 2016. (Tr. 794-798).

PA Sherrill saw plaintiff for medication refills about once a month in 2017. (Tr. 832-862). In July, plaintiff reported that his medication "is continuing to help with quality of life and completion of ADLs without significant discomfort." (Tr. 844). In August, plaintiff had been in a rear-end car accident and was having increased back and hip pain. PA Sherrill ordered an MRI. PA Sherrill continued to note limited ambulation, use of a cane, and "malalignment and limited ROM" on musculoskeletal exam. The last visit was in November 2017.

An MRI of the lumbar spine done in September 2017 showed multilevel facet joint ankylosis with auto-fusion at L4-5 and bilateral SI joint ankylosis; multilevel foraminal stenosis with right L3 and both L5 nerve roots contacting the disc bulges/osteophytes near the foramen which "could be sources for pain/radiculopathy." (Tr. 903-905).

5.   **State agency reviewers' opinions**

State agency consultants assessed plaintiff's physical RFC based on a review of the record in October 2015 and March 2016. They concluded that plaintiff was able to do work at the light exertional level with limitations. (Tr. 153-155, 187-189). The ALJ gave these opinions "little weight." (Tr. 29). The first review

8

took place before the November 2015 revision of the hip replacement. There is no indication that the second reviewer had access to the records of the revision surgery. Both reviews pre-dated the 2017 MRI.

## Analysis

Plaintiff first argues that the ALJ's analysis of whether he met a Listing was erroneous. He argues that his left hip impairment meets the requirements of Listings 1.02 and 1.03, and that his lumbar impairment meets the requirements of Listing 1.04.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled. The Listings are found at 20 C.F.R. Pt. 404, Subpt. P, App. 1. In order to be found presumptively disabled, the claimant must meet all of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis." 20 C.F.R. §404.1525(d). The claimant bears the burden of proving that he meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

The 1.00 series of the Listings covers musculoskeletal system disorders. As is relevant here, Listing 1.02 requires:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
> . . . .

9

Listing 1.03 requires "Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset."

The relevant requirements of Listing 1.04 are:

Disorders of the spine . . . resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.

With

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

The ALJ said that plaintiff did not meet the requirements of Listing 1.02 because the record "is devoid of any imaging showing any significant joint problems, and the evidence shows mostly normal/mild examination findings post-surgery…." (Tr. 25). Plaintiff argues that the ALJ ignored the statement in the operative note that there was "radiographic evidence of advanced polyethylene

10

wear and progressive osteolysis around the acetabular component as well as the greater trochanter."

The ALJ of course acknowledged that plaintiff had a revision of his failed left hip replacement, but he did not note the reference in the operative note to the "radiographic evidence." (Tr. 29). The x-ray report itself is not in the record, but as the ALJ remarked at the hearing, the record does not contain any office notes from the surgeon, only the hospital records. (Tr. 52).

Defendant makes the curious argument that the ALJ was correct not to have considered the surgeon's reference to the x-rays because to do so would have been to impermissibly "play doctor." It is true that an ALJ may not determine for himself the significance of medical studies such as MRI or x-rays. *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018); *Israel v. Colvin*, 840 F.3d 432, 439 (7th Cir. 2016). But that does not mean that the ALJ may simply ignore medical evidence. Rather, he is required to seek a medical opinion on the meaning of the studies. *Ibid.* In addition, the record did not, as the ALJ said, show "mostly normal/mild examination findings post-surgery." On the contrary, PA Sherrill consistently noted limited ambulation, use of a cane, and "malalignment and limited ROM."

Defendant also argues that plaintiff cannot meet the additional requirement of inability to ambulate effectively. This argument fails. First, that is not a basis upon which the ALJ relied. The ALJ said nothing about inability to ambulate effectively. The ALJ's decision cannot be upheld based upon the Commissioner's after-the-fact rationalization. *Hughes v. Astrue*, 705 F.3d 276, 279 (7th Cir. 2013)

11

("Characteristically, and sanctionably, the government's brief violates the *Chenery* doctrine....."); *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) (It is "improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision...."). Secondly, the argument is legally incorrect.

This is the agency's explanation of the meaning of inability to ambulate effectively:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00B.2.b.

The Commissioner assumes that inability to ambulate effectively has only the meaning ascribed to it in the first paragraph of the above section, i.e., inability to ambulate without using an assistive device or devices that involve both arms. The Seventh Circuit has rejected this view, holding that an ALJ erred in finding that a

12

claimant did not demonstrate ineffective ambulation where she used only one cane. The Court pointed out that the second paragraph of the above section provides "a nonexhaustive list of examples of ineffective ambulation, such as the inability to walk without the use of a walker or two crutches or two canes; the inability to walk a block at a reasonable pace on rough or uneven surfaces; the inability to carry out routine ambulatory activities, like shopping and banking; and the inability to climb a few steps at a reasonable pace with the use of a single handrail." *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). In other words, if needing a walker or two canes is dispositive, why provide the other examples of ineffective ambulation?

The ALJ did not mention Listing 1.03 at all. Defendant again relies on his incorrect understanding of the meaning of inability to ambulate effectively. The Court observes that Listing 1.03 requires reconstructive surgery or surgical arthrodesis, and both parties tacitly assume that plaintiff's 2015 surgery qualifies. That is a medical question which this Court is not qualified to answer.

Lastly, in considering Listing 1.04, the ALJ said that imaging studies did not show evidence of nerve root compression, spinal arachnoiditis, or stenosis resulting in pseudo-claudication. (Tr. 25). Plaintiff points to the 2017 MRI. The ALJ noted that the MRI showed foraminal stenosis and contact between nerve roots and disc bulges/osteophytes (Tr. 29) but he made no reference to the MRI in his discussion of the Listing. Again, expert medical opinion is needed to determine the significance of the MRI findings in this context. Defendant's argument about the sufficiency of the ALJ's consideration of Listing 1.04 is rejected insofar as it relies on the meaning of inability to ambulate effectively.

In sum, the Court agrees that the ALJ's discussion of the Listings was impermissibly perfunctory. *Minnick v. Colvin*, 775 F.3d 929, 936 (7th Cir. 2015).

Because of the ALJ's errors, this case must be remanded. It is unnecessary to consider the rest of plaintiff's arguments. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

### Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   July 30, 2019.**

*/s/ Donald Wilkerson*

**DONALD G. WILKERSON**
**U.S. MAGISTRATE JUDGE**